IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

EQUITY PRIME MORTGAGE, LLC, :

    Plaintiff, :

v. :     Civil Action No. GLR-17-3754

1ST FINANCIAL, INC., et al., :

    Defendants. :

## <u>MEMORANDUM OPINION</u>

THIS MATTER is before the Court on three Motions: Defendant 1st Financial, Inc.'s ("1st Financial") Motion to Dismiss Plaintiff's Complaint (ECF No. 10); Defendants/Counter-Plaintiffs[1] Donna L. Case, Tiffany Coffman, Brianna Fischer, Brandon Flohr, Kirsten Owens, James Prince, Jared Vogt, and Tia Watkins' Motion for Leave to File Amended Answers and Assert Counterclaim ("Motion for Leave to Amend") (ECF No. 17); and Movants Joseph Cammauf, Armen Manokian, and Ryan Terpay's ("Intervenors") Motion to Intervene and Amend Counterclaim to Join Intervenor/Counter-Plaintiffs ("Motion to Intervene") (ECF No. 18). This action arises from the departure of several of Plaintiff Equity Prime Mortgage, LLC's ("Equity") employees to 1st Financial, a competing mortgage lender, in the summer of 2017. The Motions are ripe for disposition, and no hearing is necessary. <u>See</u> Local Rule 105.6 (D.Md. 2018). For the reasons outlined below, the Court will grant in part and deny in part 1st Financial's Motion to Dismiss, grant the Motion for Leave to Amend, and grant the Motion to Intervene.

---

[1] Three Defendants—Fischer, Owens, and Watkins—are not Counter-Plaintiffs.

# I.    BACKGROUND[2]

Equity is a Georgia-based mortgage lender. (Pl.'s Compl. ["Compl."] ¶ 4, ECF No. 1). In May 2015, Equity hired Coffman as branch manager of its Baltimore, Maryland location. (Id. ¶ 16). In July 2016, Equity hired Prince as branch manager of its Crofton, Maryland location. (Id. ¶ 17). Coffman and Prince (collectively, the "Branch Managers") hired Case, Brianna Fischer, Flohr, Kirsten Owens, Vogt, and Watkins as staff for their branch offices. (Id. ¶ 18).

Coffman, Prince, Case, Fischer, Flohr, Owens, Vogt, and Watkins (collectively, the "Ex-Employees") all signed an employment agreement ("Employment Agreement") with Equity. (Id. ¶ 19; Compl. Ex. A ["Emp't Agmt."], ECF No. 1-2).[3] The Employment Agreement provides that the Ex-Employees owe a duty of loyalty to Equity, specifically, that they "shall assist and work for only [Equity] and no other employer, lender, broker, or other entity." (Compl. ¶ 20; Emp't Agmt. at 2). The Ex-Employees owed Equity a duty not to "[c]lose or arrange for the closing of any loan in the name of any person or entity other than [Equity], unless authorized in advance by [Equity]." (Emp't Agmt. at 3). By signing the Employment Agreement, the Ex-Employees also agreed that all loans they handled,

---

[2] Unless otherwise noted, the Court takes the following facts from Equity's Complaint and accepts them as true. See Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations omitted).

[3] Equity only included one signed employment agreement, Vogt's, as Exhibit A to the Complaint because the language "is uniform and/or comparable" in all of the Ex-Employees' employment agreements. (Compl. at 7 n.1). Defendants do not dispute this assertion. Accordingly, the Court assumes that the employment agreements are not materially different and refers to each of them as the Employment Agreement.

and materials related to those loans, were the sole property of Equity. (Compl. ¶ 22; Emp't Agmt. at 5).

Furthermore, the Employment Agreement prohibited the Ex-Employees from "attempt[ing] to move any pipeline loan[s] to any other person or entity following the end of employment." (Compl. ¶ 23; Emp't Agmt. at 5). The Ex-Employees agreed to maintain the secrecy of confidential information, which includes Equity's internal personnel and financial information, as well as proprietary information provided to Equity by any actual customer, potential customer, or third party. (Compl. ¶ 24; Emp't Agmt. at 6). Upon termination, the Ex-Employees agreed to promptly deliver to Equity all of their work product, including confidential material. (Compl. ¶ 25; Emp't Agmt. 6–7). The Ex-Employees also agreed not to compete pursuant to the Employment Agreement's "No-Solicitation," "No-Hire," and "Re-Solicitation of Borrowers" clauses. (Compl. ¶ 28; Emp't Agmt. 7–8).

In 2017, the Branch Managers began communicating with 1st Financial employees, agents, or officers. (Compl. ¶ 29). 1st Financial knew the Branch Managers and the other Ex-Employees owed Equity certain duties and obligations outlined in the Employment Agreement. (Id. ¶ 30). Nevertheless, the Branch Managers agreed with 1st Financial to subvert their contractual obligations and betray Equity, secretly working for 1st Financial while still acting as loyal Equity employees. (Id. ¶¶ 31–32). Specifically, the Branch Managers slowed the origination of residential mortgage loans at their branches, (id. ¶ 33); they "sat" on leads, developed them slowly, or refused to develop them at all, (id. ¶ 34); and they delayed, or "slow-rolled," the processing of mortgage loans so that the loans

would not close and fund until after the Ex-Employees quit Equity and joined 1st Financial, (id. ¶ 35). This scheme impacted the branches' business results in September 2017: the Crofton branch processed a lower volume of loans than it had in any month since it opened, (id. ¶ 38), and the Baltimore branch similarly experienced a drastic decline in origination volumes, (id. ¶ 40).

During the summer of 2017, Coffman, Prince, and Flohr met with other Equity employees, including Case, Fischer, Owens, Vogt, and Watkins, regarding the conspiracy. (Id. ¶ 53). Coffman, Prince, and Flohr presented the situation as a done deal, implying the branch office would be closing and the employees would lose their jobs. (Id. ¶ 54). Coffman, Prince and Flohr invited the employees to join them in their move to 1st Financial, so long as they also joined in the conspiracy against Equity. (Id.). The Ex-Employees all joined the conspiracy, agreeing to take Equity's leads, loans, and other property to 1st Financial. (Id. ¶ 55).

The Ex-Employees all resigned from Equity between July 2017 and August 2017: Fischer resigned on July 31, 2017 and began working for 1st Financial "shortly thereafter," (id. ¶ 41–42); Owens and Watkins resigned on August 15, 2017 and began working for 1st Financial "shortly thereafter," (id. ¶¶ 43–46); and on August 31, 2017, Coffman, Prince, Case, Flohr, Vogt, and others resigned, (id. ¶ 47). The staggered resignations allowed some Ex-Employees to assist 1st Financial while the other Ex-Employees still had access to Equity's confidential materials and loan files. (Id.). The day before Coffman resigned, she scheduled internal company meetings for the days after she knew she was going to resign and join 1st Financial. (Id. ¶ 50). In the run-up to her resignation, Coffman and other Ex-

Employees also bound Equity to "ruinously expensive, long-term real estate and other contracts." (Id. ¶ 51). Meanwhile, 1st Financial, including its President, supported the Ex-Employees' steps to conceal their activities from Equity and prepared to accept the Ex-Employees and Equity property at 1st Financial. (Id. ¶¶ 58–60).

Equity discovered it was missing loans and leads, laptops, and other confidential materials after the Ex-Employees resigned and contacted them as part of its investigation. (Id. ¶¶ 63–64). Coffman, Prince, and Flohr directed the other Ex-Employees not to cooperate with Equity's investigation. (Id. ¶ 65). The Ex-Employees realized Equity was aware of their activities and, therefore, knew that Equity was no longer obliged to pay them wages or commissions they would otherwise be owed. (Id. ¶ 66). Instead, 1st Financial made "hush money" payments to the Ex-Employees in those amounts. (Id. ¶¶ 67–68).

Following a month of inquiries from Equity, Flohr, through his attorney, admitted that the Ex-Employees kept Equity laptops after leaving the company. (Id. ¶¶ 70–71; Compl. Ex. B ["Flohr Ltr."], ECF No. 1-2). Flohr explained that Ex-Employees gave him their Equity laptops after Equity locked them out of the Equity offices. (Compl. ¶ 72; Flohr Ltr.). Flohr, through counsel, returned five missing laptops to Equity on October 25, 2017. (Compl. ¶¶ 72–75). Flohr stated that he never attempted to review the contents of the laptops, (Compl. ¶ 72; Flohr Ltr.), but Equity's examination of the laptops revealed someone used them after August 31, 2017 to access Equity's network, (Compl. ¶ 76). The Ex-Employees still have other confidential Equity materials, (id. ¶ 77), and Defendants continue to solicit Equity's current and prospective borrowers, (id. ¶ 78).

On December 19, 2017, Equity filed suit against 1st Financial and the Ex-Employees. (ECF No. 1). In its six-Count Complaint, Equity alleges against all Defendants: fraud (Count I); violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), Md. Code Ann., Com. Law ["CL"] §§ 11-1201, et seq. (West 2018) (Count II); breach of contract (Count III); tortious interference with a contract (Count IV); conversion (Count V); and unjust enrichment (Count VI). (Id. ¶¶ 80–108). Equity seeks compensatory, statutory, and punitive damages, as well as attorney's fees. (Id. at 25–26).

On April 6, 2018, 1st Financial filed its Motion to Dismiss Plaintiff's Complaint.[4] (ECF No. 10). On April 20, 2018, Equity filed an Opposition. (ECF No. 13). On May 4, 2018, 1st Financial filed a Reply. (ECF No. 16).

On October 19, 2018, Defendants/Counter-Plaintiffs filed their Motion for Leave to Amend Answers and Assert Counterclaim, (ECF No. 17), and Intervenors filed their Motion to Intervene and Amend Counterclaim to Join Intervenor/Counter-Plaintiffs, (ECF No. 18). On November 2, 2018, Equity filed Oppositions. (ECF Nos. 19, 20). On November 16, 2018, Defendants/Counter-Plaintiffs and Intervenors filed a combined Reply. (ECF No. 21).

---

[4] Also on April 6, 2018, Case, Fischer, Owens, Vogt, and Watkins filed their Answer. (ECF No. 7). Coffman, Flohr, and Prince filed their Answer to the Complaint on January 16, 2018. (ECF No. 4).

## II.    DISCUSSION

**A.    Motion to Dismiss**

**1.    Standard of Review**

The purpose of a Rule 12(b)(6) motion is to "test[ ] the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." King v. Rubenstein, 825 F.3d 206, 214 (4th Cir. 2016) (quoting Edwards v. City of Goldsboro, 178 F.3d 231, 243 (4th Cir. 1999)). A complaint fails to state a claim if it does not contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2), or does not "state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Twombly, 550 U.S. at 555). Though the plaintiff is not required to forecast evidence to prove the elements of the claim, the complaint must allege sufficient facts to establish each element. Goss v. Bank of America, N.A., 917 F.Supp.2d 445, 449 (D.Md. 2013) (quoting Walters v. McMahen, 684 F.3d 435, 439 (4th Cir. 2012)), aff'd sub nom., Goss v. Bank of America, NA, 546 F.App'x 165 (4th Cir. 2013).

In considering a Rule 12(b)(6) motion, a court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual

allegations in the light most favorable to the plaintiff. Albright v. Oliver, 510 U.S. 266, 268 (1994); Lambeth v. Bd. of Comm'rs, 407 F.3d 266, 268 (4th Cir. 2005) (citing Scheuer v. Rhodes, 416 U.S. 232, 236 (1974)). But, the court need not accept unsupported or conclusory factual allegations devoid of any reference to actual events, United Black Firefighters v. Hirst, 604 F.2d 844, 847 (4th Cir. 1979), or legal conclusions couched as factual allegations, Iqbal, 556 U.S. at 678.

### 2. Analysis

1st Financial argues that each Count of the Complaint against it should be dismissed for failure to state a claim.[5] The Court considers each Count in turn.

### a. Fraud

1st Financial argues Equity does not plead its fraud claim with the particularity Rule 9(b) requires. The Court agrees.

To plead a claim for deceit, also known as fraud,[6] a plaintiff must allege:

> (1) "that the defendant made a false representation to plaintiff";
>
> (2) "that its falsity was either known to the defendant or that the misrepresentation was made with reckless indifference to its truth";
>
> (3) "that the misrepresentation was made for the purpose of defrauding the plaintiff";

---

[5] Equity concedes that 1st Financial is not liable for breach of contract and that Count III of the Complaint only pertains to the Ex-Employee Defendants. The Court will, therefore, dismiss Count III as against 1st Financial.

[6] Maryland courts also refer to this tort as fraudulent misrepresentation, which consist of the same five elements. See Univ. Nursing Home Inc. v. R.B. Brown & Assocs., 506 A.2d 268, 274 (Md.Ct.Spec.App. 1986) (quoting Appel v. Hupfield, 84 A.2d 94 (Md. 1951)).

(4) "that the plaintiff relied on the misrepresentation and had the right to rely on it"; and

(5) "that the plaintiff suffered compensable injury resulting from the misrepresentation."

Kantsevoy v. LumenR LLC, 301 F.Supp.3d 577, 601 (D.Md. 2018) (quoting Nails v. S & R, Inc., 639 A.2d 660, 668 (Md. 1994)).

Rule 9(b) requires that "the circumstances constituting fraud" be stated "with particularity." Those "circumstances" include the "time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what was obtained thereby." Ward v. Branch Banking & Tr. Co., No. ELH-13-01968, 2014 WL 2707768, at *6 (D.Md. June 13, 2014) (quoting United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co., 612 F.3d 724, 731 (4th Cir. 2010)). Rule 9(b) permits "[m]alice, intent, knowledge, and other conditions of a person's mind [to] be alleged generally," however. A court should "hesitate" to dismiss a complaint under Rule 9(b) if the court is satisfied: (1) "that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial"; and (2) "that plaintiff has substantial prediscovery evidence of those facts." Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir 1999).

Here, Equity does not allege 1st Financial made any false representations. Instead, Equity pleads that 1st Financial conspired with the Ex-Employees to defraud Equity, and that the fraud caused Equity to lose $7,500,000.00 in revenue and profits. Under Maryland law, co-conspirators are liable for acts of other co-conspirators if those acts are in furtherance of or within the scope of the conspiracy. See Vollmar v. O.C. Seacrets, Inc.,

831 F.Supp.2d 862, 869 (D.Md. 2011); <u>Windesheim v. Larocca</u>, 116 A.3d 954, 976 (Md. 2015). 1st Financial, therefore, may be civilly liable for the acts of its alleged co-conspirators, the Ex-Employees. Thus, the Court must examine if Equity has pled fraud with particularity against the Ex-Employees.

While detailed in other respects, the Complaint does not support with particularity its claim of fraud against the Ex-Employees. Proceeding chronologically, Equity does not adequately allege that the Ex-Employees made false representations at the outset of their employment at Equity. The third element requires that the misrepresentation be made for the purpose of defrauding the plaintiff. <u>Kantsevoy</u>, 301 F.Supp.3d at 601. Here, Equity alleges the Ex-Employees' false representations were those of "loyalty and fidelity" in the Employment Agreement. (Compl. ¶ 82). But Equity hired Coffman in 2015 and Prince in 2016, well before 1st Financial allegedly began to conspire with them in 2017. Coffman and Prince, therefore, could not have made false representations in the Employment Agreement—which they signed at least a year before the purported conspiracy began—with the purpose of defrauding 1st Financial. Further, Equity does not allege that Coffman and Prince hired the remaining Ex-Employees as part of a conspiracy to steal leads and loans for 1st Financial several months later. Even in the light most favorable to Equity, there is no plausible allegation here that the Ex-Employees signed the Employment Agreement for the purpose of defrauding Equity.

Next, Equity does not adequately allege that the Ex-Employees made any false representations to Equity during their employment with the company. Equity merely alleges that they continued to do their jobs, albeit poorly, while preparing to take new jobs

at 1st Financial. Equity alleges the Ex-Employees "pretend[ed] to be loyal employees . . . and respond[ed] to mundane emails," (Compl. ¶ 32), but that description would apply to anyone working one job while considering her next career move. Equity does not cite any specific false representations that the Ex-Employees made to Equity during their employment that would support a fraud claim. See Ward, 2014 WL 2707768, at *6.

Finally, Equity fails to adequately plead fraud with respect to the Ex-Employees' statements about the missing Equity property after they became 1st Financial employees because Equity did not rely on those statements. The fourth element of fraud requires that the plaintiff not only rely upon the misrepresentation, but also have the right to rely upon it. Kantsevoy, 301 F.Supp.3d at 601. Equity alleges it made "numerous inquiries" after the Ex-Employees stated they did not have Equity's missing property. (Compl. ¶ 71). Equity further alleges it believes the Ex-Employees still possess Equity's property, even after it received some missing property. (Compl. ¶¶ 63, 77). Equity, therefore, does not adequately allege reliance on the Ex-Employees' false statements regarding the missing Equity property.

In sum, Equity fails to sufficiently plead a prima facie fraud claim against the Ex-Employees. Because 1st Financial did not make any direct representations to Equity, Equity's fraud claim against 1st Financial would have to be based on its alleged conspiracy with the Ex-Employees. As Equity does not adequately plead fraud against the Ex-Employees, Equity's fraud claim against 1st Financial also fails. As a result, the Court will grant 1st Financial's Motion as to Count I.

### b.     Misappropriation of Trade Secrets

1st Financial asserts that Equity does not adequately plead a violation of MUTSA because it does not identify a trade secret. The Court disagrees.

MUTSA "provides the exclusive civil remedy for misappropriation of a trade secret, 'displac[ing] conflicting tort, restitutionary, and other law of this State' that provide civil remedies for such conduct." LeJeune v. Coin Acceptors, Inc., 849 A.2d 451, 461 (Md. 2004) (alteration in original) (quoting CL § 11-1207(a)).[7]

To prove misappropriation of a trade secret [under MUTSA], a plaintiff must show that: (1) "it possessed a valid trade secret"; (2) "the defendant acquired its trade secret"; and (3) "the defendant knew or should have known that the trade secret was acquired by improper means." AirFacts, Inc. v. de Amezaga, 909 F.3d 84, 95 (4th Cir. 2018) (citing CL § 11-1201(c)(1)). MUTSA defines a trade secret as "information, including a . . . customer list, . . . program, . . . method, technique or process" that satisfies two additional conditions. CL § 11-1201(e) (West 2018).[8] First, the information must "derive[ ] independent

---

[7] There are three categorical exceptions to this preemption, none of which is relevant to this Count. One of the exceptions is relevant to Count V, conversion, and the Court addresses that exception in its analysis of the conversion Count.

[8] Pre-MUTSA, Maryland courts applied the Restatement (First) of Torts' six-factor test to determine what constituted a trade secret. AirFacts, Inc., 909 F.3d at 95 (citing Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993)). Post-MUTSA, the Restatement factors "remain[ ] useful," id., to guide the determination of what information constitutes a trade secret under MUTSA, Structural Pres. Sys., LLC v. Andrews, 931 F.Supp.2d 667, 679 (D.Md. 2013) (citing Optic Graphics, Inc. v. Agee, 591 A.2d 578, 585 (Md.Ct.Spec.App. 1991)). The six factors are:

> (1) the extent to which the information is known outside of
> [plaintiff's] business; (2) the extent to which it is known by

economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." Id. Second, it must be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." Id.

Maryland courts have concluded that processes and customer databases can qualify as trade secrets if they hold independent economic value and are subject to reasonable secrecy measures. EndoSurg Med., Inc. v. EndoMaster Med., Inc., 71 F.Supp.3d 525, 546 (D.Md. 2014). In EndoSurg Med., this Court denied the plaintiffs' motion for preliminary injunction because they could not show a likelihood of success on the misappropriation element of their MUTSA claim but denied the defendants' motion to dismiss because plaintiffs plausibly pled that their customer list had economic value and was kept secret, and that defendants used plaintiffs' customer information, methods, and processes. 71 F.Supp.3d at 546–47. Courts applying other states' versions of the Uniform Trade Secrets Act have found mortgage lead and loan processes, as well as some customer lists, to be

---

employees and others involved in [plaintiff's] business; (3) the extent of measures taken by [plaintiff] to guard the secrecy of the information; (4) the value of the information to [plaintiff] and to [plaintiff's] competitors; (5) the amount of effort or money expended by [plaintiff] in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 661 (4th Cir. 1993) (quoting Restatement (First) of Torts § 757 cmt. b). MUTSA controls, however, and Maryland courts do not apply these factors when they can determine whether information is a trade secret based upon the statutory definition and case law. See LeJeune, 849 A.2d at 462–65; Optic Graphics, 591 A.2d at 585.

trade secrets. See, e.g., Conseco Fin. Servicing Corp. v. N. Am. Mortg. Co., 381 F.3d 811, 819 (8th Cir. 2004) (holding that lead sheets and customer files, based partially on public information but enhanced by proprietary computer analysis and kept secret, were trade secrets under the Missouri Uniform Trade Secrets Act); RE/MAX, LLC v. Quicken Loans Inc., 295 F.Supp.3d 1163, 1174 (D.Colo. 2018) (concluding that lead-processing methods constitute trade secrets under the Colorado Uniform Trade Secrets Act); First Fin. Bank, N.A. v. Bauknecht, 71 F.Supp.3d 819, 839 (C.D.Ill. 2014) (holding that bank's customer lists constituted trade secrets under the Illinois Trade Secrets Act because they were economically valuable and subject to reasonable security measures). But see Heartland Home Fin., Inc. v. Allied Home Mortg. Capital Corp., 258 F.App'x 860, 862–63 (6th Cir. 2008) (holding that purchased leads, without more, were not trade secrets in Ohio, which uses the six Restatement factors). While a plaintiff is required to disclose more about its alleged trade secrets to defeat a motion for summary judgment, it must only plead plausibly in accordance with Rule 8 to survive a motion to dismiss. DSMC, Inc. v. Convera Corp., 273 F.Supp.2d 14, 24 (D.D.C. 2002).

Here, Equity identifies its trade secrets as its "processes, procedures, methods, innovations and production," including its loan pipeline program. (Pl.'s Opp'n at 4–5, ECF No. 13; Compl. ¶ 87). Equity adequately alleges the independent economic value of those processes and methods: Defendants' development of Equity's program's leads and loans at 1st Financial instead of at Equity caused Equity $7,500,000.00 in damages. Equity further alleges that its trade secret information was not known to the public, suggesting 1st Financial could only ascertain Equity's internal methods via subterfuge. Equity also pleads

that it protected the putative trade secrets by reasonable means. Not only did Equity secure the information using keys, access cards, and software on laptops, Equity also protected it via the Employment Agreement which identifies categories of confidential company information, such as methods of conducting business and customer information, and requires that employees return all such materials to Equity upon leaving the company. See LeJeune, 849 A.2d at 464–65 (holding that a company's non-disclosure agreements and files marked confidential were reasonable means of protecting trade secrets). At this stage, therefore, the Court concludes, without deciding what specifically constitute Equity's trade secrets, that Equity adequately pleads a trade secret as defined by MUTSA. EndoSurg Med., Inc., 71 F.Supp.3d at 547.

Once a plaintiff has identified a trade secret, the next step is to show that the defendant has misappropriated it. AirFacts, Inc., 909 F.3d at 95 (citing Trandes Corp., 996 F.2d at 660). "Misappropriation" under MUTSA means either:

> (1) "Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) "Disclosure or use of a trade secret of another without express or implied consent by a person who" improperly acquired it or knew another person improperly or mistakenly acquired it."

Id. (quoting CL § 11-1201(c)). "Improper means" includes "inducement of a breach of a duty to maintain secrecy." CL § 11-1201(b).

Equity sufficiently pleads 1st Financial acquired Equity's trade secret by improper means. Here, Equity alleges that 1st Financial was aware of the Ex-Employee's contractual

obligations to Equity, including a confidentiality clause pertaining to Equity's trade secrets, yet it used money and offers of employment to encourage and assist the Ex-Employees' breach of their contractual obligations of confidentiality.

Equity, therefore, sufficiently pleads a claim for misappropriation of trade secrets. As a result, the Court will deny 1st Financial's Motion as to Count II.

### c. Tortious Interference with a Contract

1st Financial maintains that Equity fails to plead adequately how 1st Financial interfered with Equity's contracts with the Ex-Employees. 1st Financial also contends, for the first time in its Reply, that the tortious interference with a contract claim is based on the same facts as the misappropriation of trade secrets claim, and therefore MUTSA preempts it.[9] Equity counters that it has supported its tortious interference claim with sufficient facts. The Court agrees with Equity.

In Maryland, to state a claim for tortious interference with a contract, a plaintiff must allege: "(1) [the] existence of a contract between plaintiff and a third party; (2) defendant's knowledge of that contract; (3) defendant's intentional interference with that contract; (4) breach of that contract by the third party; and (5) resulting damages to the plaintiff." Discovery Commc'ns, LLC v. Comput. Scis. Corp., 570 F.App'x 306, 306 (4th

---

[9] 1st Financial also makes the preemption argument with respect to the conversion and unjust enrichment Counts for the first time in its Reply. "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." United States v. Freeman, No. PWG-16-197, 2016 WL 6582645, at *4 (D.Md. Nov. 7, 2016) (quoting Clawson v. FedEx Ground Package Sys., Inc., 451 F.Supp.2d 731, 734 (D.Md. 2006)). Even though Equity did not have the opportunity to respond to 1st Financial's preemption arguments, in the interest of judicial efficiency, the Court will consider the MUTSA preemption arguments.

Cir. 2014) (per curiam) (quoting Fowler v. Printers II, Inc., 598 A.2d 794, 802 (Md.Ct.Spec.App. 1991)).

Here, Equity alleges facts that establish a prima facie claim of tortious interference with a contract. Equity pleads that there are contracts—the Employment Agreement—between Equity and the Ex-Employees. Equity alleges that 1st Financial was aware of the Employment Agreement when it conspired with the Branch Managers in the summer of 2017, first encouraging them to pretend to be loyal Equity employees while secretly working for 1st Financial, and then coordinating staggered resignations. Further, Equity alleges 1st Financial hired and paid the Ex-Employees, including what Equity would have owed them under the Employment Agreement, which caused the Ex-Employees to breach the Employment Agreement and harm Equity. The Court, therefore, concludes that Equity plausibly states a tortious interference with a contract claim.

1st Financial's preemption argument is also unpersuasive. Equity alleges a MUTSA claim, based, in part, on certain provisions in the Employment Agreement concerning trade secrets. For this claim, however, the tort alleged is based upon interference with a contract, not the contents of the contract itself or the specific fruits of the interference. See Discovery, 570 F.App'x at 306 ("It is the successful interference that is the tort, not the breach of the contract." (quoting Lake Shore Inv'rs v. Rite Aid Corp., 461 A.2d 725, 730–31 (Md.Ct.Spec.App. 1983))). MUTSA, therefore, does not preempt Equity's tortious interference with a contract claim.

In sum, Equity sufficiently pleads a prima facie claim of tortious interference with a contract that is not preempted by MUTSA. The Court will, therefore, deny 1st Financial's Motion with respect to Count IV.

### d. Conversion

1st Financial argues that Equity only adequately alleges that the Ex-Employees, not 1st Financial, converted Equity property. 1st Financial also contends that MUTSA preempts Equity's conversion claim because it is based on the same facts as the alleged misappropriation of trade secrets. The Court agrees in part.

In Maryland, to state a claim for conversion, the plaintiff must allege that the defendant: (1) engaged in a distinct act of ownership or dominion over the personal property of another in denial of his right or inconsistent with it; and (2) had an intent to exercise dominion or control over the goods inconsistent with the plaintiff's rights. Sprint Nextel Corp. v. Simple Cell Inc., 248 F.Supp.3d 663, 685 (D.Md. 2017) (citing Darcars Motors of Silver Spring, Inc. v. Borzym, 841 A.2d 828, 835 (Md. 2004)). The act of ownership can occur when the defendant acquires the property or when he retains the property longer than the rightful possessor permits. Id.

Here, Equity adequately alleges 1st Financial converted Equity's property. Equity pleads that it has the right to own and possess all the property the Ex-Employees received as Equity employees; that the Ex-Employees gave Equity's loans, leads, files, papers, and computers to 1st Financial; that the Ex-Employees accessed and utilized Equity's network via Equity's laptops after becoming 1st Financial employees in order to process those loans

and leads; and that 1st Financial was aware of the Ex-Employees actions as part of the conspiracy.

MUTSA, however, preempts Equity's conversion claim to the extent it seeks relief for the conversion of any trade secrets. As noted, MUTSA "displaces conflicting tort, restitutionary, and other law . . . providing civil remedies for misappropriation of a trade secret," except for, as relevant here, "civil remedies that are not based upon misappropriation of a trade secret." CL § 11-1207(b)(ii). Equity's claim is not only based on the conversion of trade secrets, but also on conversion of certain office supplies and equipment. (Compl. ¶ 102). Therefore, to the extent that Equity's conversion claim is based on the misappropriation of a trade secret, MUTSA preempts it. At this pre-discovery stage, before Equity further specifies which items of information are trade secrets, the Court will not dismiss Equity's conversion claim. See Swedish Civil Aviation Admin. v. Project Mgmt. Enters., Inc., 190 F.Supp.2d 785, 802 (D.Md. 2002) (denying motion to dismiss based on MUTSA preemption because both alleged trade secrets and non-trade secret confidential material were at issue and plaintiffs may plead in the alternative); see also Bond v. PolyCycle, Inc., 732 A.2d 970, 976 n.2 (Md. 1999) (concluding that a claim based solely on misappropriation of a trade secret could not survive "once a remedy under the MUTSA is obtained"). The Court will, therefore, deny 1st Financial's Motion to Dismiss with respect to Count V.

### e. Unjust Enrichment

1st Financial argues that Equity does not support its unjust enrichment claim with sufficient facts and that MUTSA preempts it. As with the conversion claim, the Court agrees in part.

In Maryland, a claim for unjust enrichment requires the plaintiff to establish that: "(1) the plaintiff conferred a benefit upon the defendant; (2) the defendant knew of or appreciated the benefit; and (3) the defendant accepted or retained the benefit under such circumstances that it would be inequitable to allow the defendant to retain the benefit without paying value in return." Hobbs v. St. Martin, 320 F.Supp.3d 748, 752 (D.Md. 2018) (quoting Hill v. Cross Country Settlements, LLC, 936 A.2d 343, 351 (Md. 2007)).

Here, Equity alleges the Ex-Employees gave Equity's mortgage loans and leads, among other information and objects, to 1st Financial in the summer of 2017; that 1st Financial knew of the benefit, based on its conspiracy with the Ex-Employees; that 1st Financial retained the benefit of Equity's loans, leads, information, and objects, garnering revenues and profits; and that 1st Financial received that benefit without having to pay Equity for it. Equity, therefore, sufficiently pleads an unjust enrichment claim against 1st Financial.

MUTSA, however, preempts Equity's unjust enrichment claim to the extent it is based on the misappropriation of trade secrets. As noted above, MUTSA displaces, among other civil remedies, restitutionary remedies. CL § 11-1207(a)). A claim for unjust enrichment seeks a restitutionary remedy. "A person who receives a benefit by reason of an infringement of another person's interest, or of loss suffered by the other, owes

restitution to him in the manner and amount necessary to prevent unjust enrichment." <u>Berry & Gould, P.A. v. Berry</u>, 757 A.2d 108, 113 (Md. 2000) (quoting Restatement (Second) of Restitution § 1 (Tentative Draft No. 1, 1983)).

MUTSA, therefore, preempts Equity's unjust enrichment claim to the extent it seeks restitution based on misappropriation of trade secrets. To the extent Equity's unjust enrichment claim is not based on misappropriation of trade secrets, it is not preempted. At this stage, then, because the Court has not yet determined which of Equity's information is a trade secret, it will not dismiss the unjust enrichment Count. As a result, the Court will deny 1st Financial's Motion with respect to Count VI.

In sum, the Court will grant 1st Financial's Motion as to Counts I and III and otherwise deny it.

## B.      Motion to Amend and Assert Counterclaim

In their proposed Counterclaim, Defendants/Counter-Plaintiffs assert they did not receive the base pay, commissions, or bonuses to which they were entitled for their last month of work at Equity, August 2017. (Countercl. ¶¶ 37–41, ECF No. 17-1). The three-Count Counterclaim alleges: breach of the Defendants/Counter-Plaintiffs' Employment Agreement (Count I); violation of Maryland Wage Payment and Collection Act, Md. Code Ann., Lab. & Empl. §§ 3-501 <u>et seq.</u> (West 2018) (Count II); and unjust enrichment (Count III). (Countercl. ¶¶ 42–57, ECF No. 17-1). They seek monetary damages and attorneys' fees. (<u>Id.</u> at 14, 16–17). Defendant/Counter-Plaintiffs also propose to amend their Answers by adding a twelfth affirmative defense, "a set off" of the damages owed to Equity in light of the Counterclaim. (Am. Answers at 12, 24, ECF No. 17-1).

Equity contends the Defendants/Counter-Plaintiffs' amendment and Counterclaim are prejudicial, in bad faith, and futile. Defendants/Counter-Plaintiffs argue they should be permitted to amend their Answers and file the Counterclaim because the Court has not yet issued a scheduling order and there is no prejudice to Equity. The Court agrees with Defendants/Counter-Plaintiffs.

A district court "should freely give leave [to amend] when justice so requires." Fed.R.Civ.P. 15(a)(2). "This liberal rule gives effect to the federal policy in favor of resolving cases on their merits instead of disposing of them on technicalities." Laber v. Harvey, 438 F.3d 404, 426 (4th Cir. 2006) (citing Conley v. Gibson, 355 U.S. 41, 48 (1957)). Under Rule 15(a)(2), the "grant or denial of an opportunity to amend is within the discretion of the district court." Drager v. PLIVA USA, Inc., 741 F.3d 470, 474 (4th Cir. 2014) (quoting Scott v. Family Dollar Stores, Inc., 733 F.3d 105, 121 (4th Cir. 2013)). A district court's denial of leave to amend is appropriate when: "(1) 'the amendment would be prejudicial to the opposing party;' (2) 'there has been bad faith on the part of the moving party;' or (3) 'the amendment would have been futile.'" Id. (quoting Scott, 733 F.3d at 121).

The possibility of prejudice is "[p]erhaps the most important factor" in this analysis. Class Produce Grp., LLC v. Harleysville Worcester Ins. Co., No. ELH-16-3431, 2017 WL 2377105, at *9 (D.Md. May 31, 2017) (quoting 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure (2004 & 2015 Supp.) ("Wright & Miller"), § 1487 at 701). An amendment is not prejudicial "if it merely adds an additional theory of recovery to the facts already pled and is offered before any discovery has occurred." Id. (quoting Laber,

438 F.3d at 427); see also Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980) ("Because [the opposing party] was from the outset made fully aware of the events giving rise to the action, an allowance of the amendment could not in any way prejudice the preparation of [the opposing party's] case."). The party opposing amendment bears the burden of showing prejudice. Class Produce Grp., 2017 WL 2377105, at *9 (quoting Atl. Bulk Carrier Corp. v. Milan Exp. Co., 3:10-cv-103, 2010 WL 2929612, *4 (E.D.Va. July 23, 2010)). "[I]f the court is persuaded that no prejudice will accrue, the amendment should be allowed." Id. (alteration in original) (quoting Wright & Miller, § 1487 at 701).

Here, granting leave to amend is appropriate. Equity is not prejudiced for two reasons. First, the Complaint references a possible wage claim, alleging, "the Ex-Employees knew that Equity no longer had any obligation to pay any monies otherwise owed to the Ex-Employees, such as any still-pending wage or commission payments." (Compl. ¶¶ 66–67). This shows Equity is, and has been for some time, aware of the facts underlying the proposed amendments. Davis, 615 F.2d at 613. Second, the Court has not issued a scheduling order in this case, so formal discovery has not yet begun. Laber, 438 F.3d at 427.

Equity's bad-faith argument focuses on the Defendants/Counter-Plaintiffs delay in filing and coordination with the Intervenors. While the Court does not understand how Defendants/Counter-Plaintiffs' counsel's reason for the delay in filing the Motion is evidence of good faith, (Reply at 4 n.2, ECF No. 21), the Court does not find the delay in filing to be bad faith on the part of Defendants/Counter-Plaintiffs. Laber, 438 F.3d at 427 ("Delay alone . . . is an insufficient reason to deny [a] motion to amend."). In addition, for

the reasons discussed below, the Intervenors' Motion is not frivolous and, therefore, does not support a finding of bad faith.

As for futility, leave to amend "should only be denied on the ground of futility when the proposed amendment is clearly insufficient or frivolous on its face." <u>Johnson v. Oroweat Foods Co.</u>, 785 F.2d 503, 509 (4th Cir. 1986). Equity's one-paragraph futility argument is largely conclusory and unsupported, (Counter-Def.'s Opp'n ¶ 9, ECF No. 20), and fails to demonstrate that the Defendants/Counter-Plaintiffs proposed amendments or Counterclaim are clearly insufficient or frivolous.

In sum, given the lack of prejudice to Equity and the liberal nature of Rule 15(a), the Court concludes that permitting Defendants/Counter-Plaintiffs to amend is appropriate. As a result, the Court will grant Defendants/Counter-Plaintiffs' Motion to Amend Answers and Assert Counterclaim.

## C.    Motion to Intervene and Amend Counterclaim

The Intervenors argue they should be permitted to join the Defendants/Counter-Plaintiffs' Counterclaim because their compensation-related claims against Equity share common questions of law and fact with the Counterclaim. They seek to amend the Counterclaim to add facts about their employment with Equity and 1st Financial during the same time period and join the three claims against Equity. Equity maintains that the Intervenors' request is untimely and prejudicial, that their claims do not share common questions of law or fact with the Complaint, and that there are no independent grounds for jurisdiction over the Intervenors' claims. The Court addresses Equity's arguments in turn.

### i. Timeliness

The threshold issue for a Rule 24(b)(1) motion is whether the motion is timely. To make this preliminary determination, the Court considers three factors: "first, how far the underlying suit has progressed; second, the prejudice any resulting delay might cause the other parties; and third, why the movant was tardy in filing its motion." Alt v. U.S. EPA, 758 F.3d 588, 591 (4th Cir. 2014). "The determination of timeliness is committed to the [Court's] sound discretion," which is "wide" in this context. Id. (internal quotation marks omitted). "The purpose of the [timeliness] requirement is to prevent a tardy intervenor from derailing a lawsuit within sight of the terminal." Scardelletti v. Debarr, 265 F.3d 195, 202 (4th Cir. 2001) (quoting United States v. S. Bend Cmty. Sch. Corp., 710 F.2d 394, 396 (7th Cir. 1983), rev'd on other grounds sub nom. Devlin v. Scardelletti, 536 U.S. 1 (2002). If a motion to intervene is timely, the Court may, in its "sound discretion," grant or deny the Motion. United States v. Cont'l Cas. Co., No. ELH-16-3047, 2017 WL 3642957, at *5 (D.Md. Aug. 24, 2017) (quoting Smith v. Pennington, 352 F.3d 884, 892 (4th Cir. 2003)). "[L]iberal intervention is desirable to dispose of as much of the controversy involving as many apparently concerned persons as is compatible with efficiency and due process." Am. Humanist Ass'n v. Maryland-Nat'l Capital Park & Planning Comm'n, 303 F.R.D. 266, 271 (D.Md. 2014) (alteration in original) (internal quotations omitted) (quoting Feller v. Brock, 802 F.2d 722, 729 (4th Cir. 1986)).

Here, the Intervenors' Motion is timely. While more than a year has passed since Equity filed its Complaint, the Court has not issued a scheduling order, and no formal discovery has not begun. This suit, therefore, has not progressed very far, and there is no

indication it is "within sight of the terminal." Debarr, 265 F.3d at 202. The prejudice to Equity of defending a wage claim from three additional former employees, when it already must defend the Counterclaim, is minimal. Further, as discussed above, Equity indicated the possibility of such a claim in the Complaint and therefore is familiar with the facts underlying it. The Intervenors do not explain why they moved to intervene several months after Defendants filed their Answers, but this does not require denial of the Motion. Alt, 758 F.3d at 591. The efficient disposition of the Intervenors' claims, along with the stage of the case and lack of prejudice to Equity, counsels otherwise. The Court, therefore, concludes that the Motion satisfies the timeliness threshold of Rule 24(b)(1).

### ii.  Common Questions of Law and Fact

The Court concludes that the Intervenors' claims share with the main action a common question of law or fact. The Court "may permit anyone to intervene who has a claim . . . that shares with the main action a common question of law or fact." Fed.R.Civ.P. 24(b)(1)(B). The Intervenors' claims are based on many of the same facts as the Complaint and Counterclaim. Intervenors Cammauf, Manokian, and Terpay started working for Equity in its Crofton branch in August 2016—approximately the same time as the other non-manager Ex-Employees. (Am. Countercl. ¶¶ 18–20, ECF 18-1). The Intervenors signed the Employment Agreement like other non-manager Ex-Employees. (Id. ¶¶ 27–30). Like several of the Ex-Employees, the Intervenors resigned from Equity on August 31, 2017. (Id. ¶ 50). The Intervenors also went to work for 1st Financial. (Mot. Intervene ¶ 6). Thereafter, Equity did not pay the Intervenors their commissions for August 2017. (Id. ¶¶ 57–59). In terms of common legal issues, the Complaint contemplates a wage claim by the

Defendants/Counter-Plaintiffs, and the Intervenors' claims are the same as those of Defendants/Counter-Plaintiffs.

### iii.    Jurisdiction

Equity argues that the Court does not have supplemental jurisdiction to hear the Intervenors' state-law claims. The Intervenors counter that case law interpreting the supplemental jurisdiction statute, 28 U.S.C. 1367(b) (2018), dictates the opposite conclusion. The Court agrees with the Intervenors.

"[F]ederal courts are courts of limited jurisdiction." Home Buyers Warranty Corp. v. Hanna, 750 F.3d 427, 432 (4th Cir. 2014) (quoting Kokkonen v. Guardian Life Ins. Co. of America, 511 U.S. 375, 377 (1994)). There are three principal bases for subject-matter jurisdiction in federal court: (1) federal-question jurisdiction; (2) diversity jurisdiction; (3) and supplemental jurisdiction. Costley v. City of Westminster, No. GLR-16-1447, 2017 WL 5635463, at *1 (D.Md. Jan. 26, 2017); see also Exxon Mobil Corp. v. Allapattah Servs., Inc., 545 U.S. 546, 552 (2005). Diversity jurisdiction exists when there is an amount in controversy exceeding $75,000.00, exclusive of interests and costs, and complete diversity of citizenship. See 28 U.S.C. § 1332(a) (2018). The Court has original jurisdiction over this case through diversity jurisdiction.

Under the doctrine of supplemental jurisdiction, when a district court has original jurisdiction, it also has jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a) (2018). When a district court only has subject-matter jurisdiction based on diversity, however, it does not have supplemental jurisdiction over "claims by persons

. . . seeking to intervene as plaintiffs under Rule 24" when the court would not have independent jurisdiction over those claims.  28 U.S.C. § 1367(b).

Several federal appellate courts have interpreted this limiting language of § 1367(b), taking note of its legislative history. "The supplemental jurisdiction provision, 28 U.S.C. § 1367(b), states congressional intent to prevent original plaintiffs—but not defendants or third parties—from circumventing the requirements of diversity." Grimes v. Mazda N. Am. Operations, 355 F.3d 566, 572 (6th Cir. 2004); see also Viacom Int'l, Inc. v. Kearney, 212 F.3d 721, 726–727 (2d Cir. 2000). The United States Court of Appeals for the Fourth Circuit has held "the limitation of § 1367(b) applies only to plaintiffs' efforts to join nondiverse parties." United Capitol Ins. Co. v. Kapiloff, 155 F.3d 488, 492 (4th Cir. 1998). Subsequent circuit court decisions have further clarified the issue, interpreting "plaintiffs" in § 1367(b) to mean "original" plaintiffs, not parties adverse to the original plaintiff like defendants or counter-plaintiffs. Allstate Interiors & Exteriors, Inc. v. Stonestreet Const., LLC, 730 F.3d 67, 73 (1st Cir. 2013) ("[W]e now hold that 'plaintiff' in section 1367(b) refers to the original plaintiff in the action . . .").

Here, the Intervenors seek to intervene under Rule 24 as Counter-Plaintiffs in the Counterclaim against Equity. The Intervenors' claims meet the requirements of § 1367(a) because, as discussed above, they are "so related to claims in the action within [the Court's] original jurisdiction that they form part of the same case or controversy." In light of the developing circuit court consensus on this issue, including the Fourth Circuit's consistent holding in Kapiloff, the Intervenors' claims fall outside § 1367(b)'s limiting language. The Intervenors did not initiate this action, and therefore Congress's intent to prevent

28

jurisdictional gamesmanship is not frustrated by a finding of supplemental jurisdiction here.

The Court, therefore, concludes that intervention is appropriate. As a result, the Court will grant the Intervenors' Motion.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part 1st Financial's Motion to Dismiss Plaintiff's Complaint (ECF No. 10). The Court will grant the Motion with respect to Counts I and III. The Court will deny the Motion with respect to Counts II, IV, V, and VI. The Court will also grant Defendants/Counter-Plaintiffs' Motion to File Amended Answers and Assert Counterclaim (ECF No. 17) and the Intervenors' Motion to Intervene and Amend Counterclaim to Join Intervenor/Counter-Plaintiffs (ECF No. 18). A separate Order follows.

Entered this 22nd day of February, 2019.

_____/s/_____
George L. Russell, III
United States District Judge